787 So.2d 357 (2001)
Linda BOZEMAN, Individually and on Behalf of Tommy Bozeman, Plaintiff-appellee,
v.
STATE of Louisiana, and the Department of Transportation and Development, Defendant-appellant.
No. 34,430-CA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 2001.
Rehearing Denied May 3, 2001.
Writ Denied June 29, 2001.
*360 Claude W. Bookter, Jr., Special Assistant Attorney General, Counsel for Appellant.
Jack M. Bailey, Jr., Shreveport, William G. Adamson, Counsel for Appellee.
Before BROWN, CARAWAY and PEATROSS, JJ.
CARAWAY, J.
This action arose from an automobile accident which the plaintiff alleged was caused by a defective shoulder on a state highway. The trial court found the State of Louisiana 75% at fault for the unreasonable risk of harm created by a three inch drop-off from the blacktop to the shoulder. The driver of the vehicle was apportioned with 25% of the fault for the accident. The State appeals urging various assignments of error, including the trial court's finding of unreasonable risk of harm and its special damages award of $613,626.64 for medical expenses covered by Medicaid or Medicare. For the reasons which follow, we affirm in part and remand.

Facts
On May 12, 1993, Tommy Bozeman ("Tommy") was driving a 1976 DJ-5 Jeep on Highway 173, traveling within the posted speed limit of 55 mph. As he encountered a curve prior to Highway 173's intersection with Industry Park Drive (just north of Shreveport), his right tires left the paved road at the point where there was a drop-off between the surface of the blacktop and the shoulder. The shoulder drop-off measured 150 feet in length and varied in depth from two to over three and one-half inches. As Tommy attempted to re-enter the paved road, he lost control of the vehicle. His Jeep was flung in a "sling shot" manner across the road, fell onto its side, and slid until it struck the curb on the west corner of the intersection. The vehicle flipped and landed on its side in a ditch. Tommy was seriously injured and transported by helicopter to LSU Medical Center.
As a result of his injuries, Tommy remained in a semiconscious state for three years and three months until his August 29, 1996 death. Upon his release from LSU Medical Center, Tommy remained in a long-term health care facility for round-the-clock care. Tommy was 40 years old at the time of the accident, and was married to Linda Bozeman ("Bozeman"), with whom he had a son. He also had a grown son from a previous marriage.
Bozeman, individually and on behalf of Tommy, sued the State of Louisiana, Department of Transportation and Development (the "State" or "DOTD"), alleging that the unreasonably dangerous and defective condition of the shoulder caused Tommy to lose control of his Jeep and sustain the injuries which resulted in his death. Chrysler Corporation, Jeep-Eagle Corporation, and other related co-defendants (hereinafter collectively "Chrysler") were later added as defendants in Bozeman's second and third supplemental and amending petitions. By 1998, the Chrysler defendants were dismissed from the suit, leaving only the claims against the State.
After trial, the trial court issued written findings of fact and reasons for judgment. The trial court ruled that the accident was the combined fault of the State (75%) and Tommy (25%). The trial court found that there was a drop-off of approximately three inches, and that the drop-off precluded Tommy from safely returning to the paved roadway. Thus, the trial court *361 ruled that the shoulder drop-off presented an unreasonable risk of harm to Tommy and other motorists, and that the State knew or should have known of the hazardous condition. Further, the trial court ruled that Tommy was driving within the posted speed limit, and that as Tommy approached the curve, his right tires left the paved portion of the road. The trial court entered judgment awarding damages to plaintiff in the amount of $1,241,988.64, subject to the 25% reduction for Tommy's comparative fault.
In five assignments of error, the State complains that the trial court erred in finding that the shoulder drop-off where Tommy allegedly left and attempted to return to the highway presented an unreasonable risk of harm; that the trial court erred in preventing a witness from testifying regarding his visit to the accident scene in January 2000; that the trial court erred by excluding portions of the deposition testimony of Deputies John Norsworthy and Mike Christian; that the trial court erred in failing to keep the trial of this matter open to allow the State to call an expert witness to attempt to prove the negligence of Chrysler for the accident; and that the trial court erred in failing to give a credit or reduction in medical expenses for payments made by Medicaid/Medicare.

Discussion
Before review of the State's primary claim that no unreasonable risk of harm was proven, we first consider two preliminary issues raised by the State disputing its liability. The State first contends that there was no physical evidence showing that Tommy's vehicle left the paved portion of the highway and encountered the shoulder drop-off. We disagree.
Plaintiff's expert, Dr. John Glennon, testified that he examined the Jeep and noticed a 2 to 2-½ inch scuff mark on the inside of the right tire of Tommy's vehicle. Dr. Glennon further stated that this type of tire marking is consistent with contact with an edge drop between the paved road and the shoulder. Additionally, Deputy John Norsworthy testified in his deposition that he saw the tire marks left by Tommy's Jeep on the gravel aggregate shoulder just after the accident. Deputy Norsworthy also stated that he did not notice any significant drop-off where Tommy left the road. Thus, Deputy Norsworthy did not take any measurements during his investigation of the accident. Lastly, the only eyewitness of the accident, Janet Wigton, who was traveling approximately one hundred yards behind Tommy just prior to the accident, stated that Tommy was not driving erratically and that she did not notice him making any sharp, sudden movements in his Jeep. Although she did not see him leaving the highway, Wigton stated that Tommy's vehicle shot across the highway, slid on its side, flipped and went up in flames when it hit a curb on the other side of the road. Dr. Glennon corroborated that this "sling-shot" effect is created when a vehicle encounters an abrupt drop-off and the driver overcompensates when returning to the roadway.
A trial court's finding of causation is a matter of fact. Bacle v. Wade, 607 So.2d 927, 933 (La.App. 2d Cir.1992); Antee v. Southern Pacific Transp. Co., 627 So.2d 798 (La.App. 2d Cir.1993). When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the Court of Appeal may feel differently. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). In this case, we find that the trial court's ruling that the accident was caused by the shoulder drop-off is supported by the record.
*362 Next, the State argues that the evidence did not reveal that the method by which Highway 173 was inspected established that the State had constructive notice of the drop-off. Nevertheless, the trial court's finding of actual and/or constructive knowledge is of no consequence in this case, because, as plaintiff correctly argues, the State is strictly liable for the defective condition of the shoulder. This accident occurred on May 13, 1993, prior to the substantive change in the law under the 1995 constitutional amendment to Article XII, § 10 allowing for the application of La. R.S. 9:2800.[1] Under Jacobs v. City of Bunkie, 98-2510 (La.5/18/99), 737 So.2d 14, La. R.S. 9:2800's notice requirements cannot be applied retroactively to Bozeman's cause of action.
In Jacobs, the supreme court held that the notice requirement of La. R.S. 9:2800 prior to the 1995 constitutional amendment to Article XII, § 10 was unconstitutional. Furthermore, in Dupree v. City of New Orleans, 99-3651 (La.9/1/00), 765 So.2d 1002, the supreme court applied strict liability under La. C.C. art. 2317 to find in favor of an injured plaintiff in a defective road accident which occurred prior to 1995. Therefore, Bozeman was not required to prove that the DOTD had actual or constructive notice of the shoulder defect.

Unreasonable Risk of Harm
In view of Jacobs, supra and Dupree, supra, Bozeman needed only to prove that the thing which caused the damage was in defendant's care or custody and that it presented an unreasonable risk of harm, or that the thing was defective. Guzman v. State, 95-0957 (La.App. 1st Cir.12/15/95), 664 So.2d 1343; see also, Crowell v. City of Alexandria, 558 So.2d 216 (La.1990). The DOTD has the basic responsibility for maintaining state highways. La. R.S. 48:21; Bethea v. Louisiana Dept. of Transp. and Development, 415 So.2d 535 (La.App. 1st Cir.1982). DOTD also has the duty to keep all state owned or state maintained shoulders in a reasonably safe condition. Hood v. State Through Dept. of Transp. and Development, 587 So.2d 755 (La.App. 2d Cir.), writs denied, 590 So.2d 81, 82 (La.1991). DOTD's duty encompasses the obligation to protect a motorist who intentionally or unintentionally drives onto the shoulder. Rue v. State, Department of Highways, 372 So.2d 1197 (La.1979); Hood, supra. Although DOTD is not the insurer of all travelers safety, it cannot knowingly allow a condition to exist which is hazardous to a reasonably prudent motorist. Coleman v. State, Through Dept. of Transp. and Development, 524 So.2d 1281, 1284 (La.App. 3d Cir.1988); Rochelle v. State, Through Dept. of Transp. and Development, 570 So.2d 13 (La.App. 3d Cir.1990), writ denied, 572 So.2d 93 (La.1991); Hood, supra.
Prudent behavior for a motorist who inadvertently drives off the paved road onto the shoulder is first to reduce speed and then to attempt a gradual reentry after the motorist has regained control of the vehicle. Hardenstein v. Cook Const., Inc., 96-0829 (La.App. 1st Cir.2/14/97), 691 So.2d 177, writ denied, 97-0686 (La.4/25/97), 692 So.2d 1093. The DOTD's duty to maintain highway shoulders is imposed to protect a motorist from the risk of injury produced by a *363 combination of the motorist's inadvertent encounter with an unexpected, sharp drop-off from the roadway and his consequent instinctive over steering of the vehicle. LeBlanc v. State, 419 So.2d 853 (La.1982). In the absence of knowledge and a reasonable opportunity to avoid shoulder defects, the motorist is entitled to assume that a highway shoulder is maintained in a reasonably safe condition, and that his inadvertent deviation onto it will not lead to disastrous consequences. Id. Further, in LeBlanc, the court stated, "a motorist's instinctive overreaction to an unexpected... drop-off from a paved highway to its shoulder, produced by a combination of the Department's failure to provide a continuous even surface and the plaintiffs inadvertent straying onto the shoulder, is within the scope of protection of the rule of law which requires the Department to maintain safe highway shoulders." Id. at 856.
The unreasonable risk of harm criterion entails a myriad of considerations and cannot be applied mechanically. Landry v. State, 495 So.2d 1284 (La.1986). Consequently, the findings of the jury or trial court should be afforded deference and thus, the ultimate determination of unreasonable risk of harm is subject to review under the manifest error standard. A reviewing court may only disturb the lower court's holding upon a finding that the trier of fact was clearly wrong or manifestly erroneous. Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362, 363; Lewis v. State Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311; Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Lebeaux v. Newman Ford, Inc., 28,609 (La.App.2d Cir.9/25/96), 680 So.2d 1291.
The State asserts that this case is similar to Aetna Casualty & Surety Co. v. State Through Dept. of Transp. and Development, 97-0716 (La.App. 1st Cir.4/8/98), 712 So.2d 216, writ denied, 98-1241 (La.7/2/98), 724 So.2d 209. In Aetna, the drop-off between the shoulder and roadway measured ¼ inch where plaintiff left the road, to 2-½ inches where the plaintiff returned to the roadway. Between the two points, the drop-off increased to 4 inches, but there was no evidence in the record to show how far the four inch dropoff extended. The State's reliance on Aetna is misplaced.
In Aetna, plaintiffs account of the accident was uncorroborated by any expert testimony. Also, plaintiff was extremely intoxicated, was speeding, and was said to be driving erratically just prior to and at the time of the accident. The investigating state trooper in Aetna testified that there was no physical evidence that the plaintiff's tires rubbed against the pavement. Thus, the trial court doubted plaintiffs account of the accident and ruled that even if plaintiff encountered the shoulder drop-off, the drop-off was not the cause of the accident. The First Circuit agreed, stating "[w]e do not find the drop-off between the shoulder and the roadway constituted an unreasonably dangerous condition, nor do we find the drop-off caused or contributed to the accident."
Both Bozeman and the State point us to several "drop-off" cases for guidance and comparison. See, LeBlanc, supra, (4-6 inch drop-off); Guzman, supra, (3 inch drop-off with State being held 50% negligent); Perez v. State Through Dept. of Transp. and Development, 578 So.2d 1199 (La.App. 4th Cir.), writ denied, 581 So.2d 706 (La.1991) (8 inch drop-off with State being held 40% negligent); Deville v. State Through Dept. of Transp. and Development, 498 So.2d 1142 (La.App. 3d Cir.1986) (6-3/4 inch drop-off); Tubre v. State Through Dept. of Transp. and Development, 96-1194 (La.App. 3d Cir.4/2/97), 693 *364 So.2d 1190, writs denied, 97-1913, 97-1916 (La.11/21/97), 703 So.2d 1307 (6 inch drop-off with State being held 50% negligent); Hardenstein, supra, (3-4 inch drop-off, but State not held to be negligent, because the cause-in-fact of the accident was plaintiffs speeding); Bethea, supra, (Where all the DOTD witnesses agreed that a drop-off of more than 2 inches created a dangerous condition); Barsavage v. State Through Dept. of Transp. and Development, 96-0688 (La.App. 1st Cir.12/20/96), 686 So.2d 957, writs denied, 97-0595, 97-0634 (La.4/18/97), 692 So.2d 455, 456; Brown v. Dept. of Transp. and Development, 604 So.2d 99 (La.App. 3d Cir.1992) (Where the court held that a 2-½ to 3 inch difference between the shoulder and highway, encountered by a motorist negotiating a curve, was substandard and defective); Caruthers v. State Through Dept. of Transp. and Development, 97-1450 (La. App. 3d Cir.4/15/98), 711 So.2d 420, writ denied, 98-1368 (La.7/2/98), 724 So.2d 735 (Generally, a roadway is considered defective and unreasonably dangerous when the depth of its drop-off exceeds 2 inches); Orillion v. Carter, 93-1190 (La.App. 1st Cir.6/24/94), 639 So.2d 461, writ denied, 94-2289 (La.11/18/94), 646 So.2d 384, writ denied, 94-2272 (La.11/18/94), 650 So.2d 240 (Driver negotiating curve encountered a 2-3 inch drop between paved road and shoulder, court affirmed finding of defect); Guzman, supra (Driver entering curve encountered 3 inch shoulder drop-off, court affirmed finding of defect); and Hood, supra (4 inch shoulder drop-off, not associated with a curve, was unreasonably dangerous to normal use).
As shown by the above cited jurisprudence, courts have consistently held that an abrupt drop-off between a roadway and a shoulder may constitute a defect. See also, Aetna, 712 So.2d at 220; Guzman, 664 So.2d at 1348; LeBlanc, 419 So.2d at 856; Hood, 587 So.2d at 759. Whether the roadway and shoulder at the scene of an accident were in an unreasonably dangerous condition depend on the facts of each case. Perez, 578 So.2d at 1203-04; Orillion, 639 So.2d at 465, citing, Boudreaux v. Farmer, 604 So.2d 641, 651 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992); Hardenstein, 691 So.2d at 187. A condition which might create an unreasonable risk of harm in one factual situation may not present the same risk in other circumstances. Hardenstein, supra.
Based upon the plaintiffs investigation of the site soon after the accident, the drop-off between the level of the blacktop surface and the level of the shoulder ran 150 feet along a curve in Highway 173. The drop-off's measurements varied in depth from 2 to 3-½ inches. From our review of the photos of the highway, we note that the degree of the arch of the curve is fairly significant, particularly in view of the 55 mph speed limit. Upon leaving the blacktop, a driver's instinctive over-steering reaction could be expected to be greater, given the forces on the vehicle in the curve and the forward view of the driver, which in this instance, would be directed toward the thick forest of trees overhanging the narrow shoulder and ditch. Dr. Glennon, the only expert to testify, expressed the opinion that any drop-off over two inches along the curve of this 55-mph road would be hazardous.
The State disputes the location where Tommy's vehicle would have re-entered the highway, based upon the gouge marks on the highway and other physical evidence. The State asserts that at the point where the re-entry occurred, the shoulder drop-off would have been 2-½ inches or less. Nevertheless, at that place, the vehicle's position within the curve of the highway remained a critical factor in assessing *365 the sudden circumstances in which Tommy was placed upon leaving the blacktop. Accordingly, we find that the significance of the curve on this highway, with a narrow shoulder/right-of-way, reasonably supports the trial court's finding of an unreasonable risk of harm. Furthermore, the existence of a drop-off of only 2-½ inches at the vehicle's re-entry point does not, under the facts of this case, require a finding of manifest error.

Evidentiary Issues
The State called Kevin Zimmerman, an investigator for John T. Parker Claims Service, as a witness. Zimmerman visited the accident scene in December 1993, at which time he measured the length of the drop-off and photographed the scene. He returned to the scene again immediately before trial in January 2000 to supplement his investigation. When Zimmerman was asked about certain distances measured during his January 2000 visit, plaintiff's counsel objected, based upon the State's failure to supplement plaintiff's prior discovery request. The trial court sustained plaintiff's objection and excluded Zimmerman's testimony regarding his January 2000 supplementary investigation. The State proffered the evidence.
Under La. C.C.P. art. 1428, a party has a duty to seasonably supplement discovery responses. Courts have regularly exercised their inherent powers by imposing sanctions for failing to timely supplement discovery responses. A trial court generally has great discretion to determine whether to admit testimony after a party objects on the ground that his opponent failed to fulfill the statutory mandate of La. C.C.P. art. 1428 to supplement discovery requests. Chapman v. Regional Transit Authority/TSMEL, 95-2620 (La. App. 4th Cir.10/2/96), 681 So.2d 1301; Jordan v. Intercontinental Bulktank Corp., 621 So.2d 1141, 1151-52 (La.App. 1st Cir.), writs denied, 623 So.2d 1335, 1336 (La. 1993), cert. denied, 510 U.S. 1094, 114 S.Ct. 926, 127 L.Ed.2d 219 (1994).
Considering that Zimmerman's second visit to the scene was made approximately seven years after the accident and that his testimony was offered as a fact witness and not an expert, we find no abuse of the trial court's discretion. Moreover, based upon our review of the proffered testimony and in light of our ruling above concerning the defective condition of the shoulder, the evidence concerning Zimmerman's measurements during his second visit does not change our ruling.
Secondly, the State argues that the trial court erred when it excluded portions of the deposition testimony of Deputies Norsworthy and Mike Christian. The excluded portions of Deputy Norsworthy's testimony regarded "yaw marks," the point where the Jeep hit the curb, as well as what happened after the Jeep struck the curb, and the length the Jeep traveled before it flipped on its top and/or side. Plaintiff claimed that Deputy Norsworthy was not an expert witness in accident reconstruction, and that the trial court should not receive any opinion testimony from this lay witness. The trial court also excluded similar portions of Deputy Christian's deposition pursuant to Bozeman's objection.
Deputies Norsworthy and Christian were not qualified as accident reconstruction experts. Therefore, their testimony in the form of opinions is limited to those opinions based on their rational perception of the facts and recollections pertaining to the scene of the accident. La. C.E. art. 701; Whetstone v. Dixon, 616 So.2d 764 (La.App. 1st Cir.), writ denied, 623 So.2d 1333 (La.1993). Such testimony *366 is allowed when the information is within the officer's personal knowledge and can be acquired through his experience. State v. Lowery, 609 So.2d 1125 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La. 1993). The trial court is vested with much discretion in determining first, which opinion testimony shall be received into evidence, and second whether it will be received as "lay" or "expert" testimony. Cho v. Royal Oldsmobile Co., Inc., 98-527 (La.App. 5th Cir.11/25/98), 722 So.2d 1138; Griffin v. Tenneco Oil Co., 625 So.2d 1090 (La.App. 4th Cir.1993), writ denied, 93-2710 (La.1/7/94), 631 So.2d 449; Merrells v. State Farm Mut. Auto. Ins. Co., 33,404 (La.App.2d Cir.6/21/00), 764 So.2d 1182.
From our review of the officers' testimony and their prior experience, we find no abuse in the trial court's ruling. Deputy Christian was not at the scene for more than ten minutes, and Deputy Norsworthy, because of the darkness, did not take any actual measurements at the accident scene.
Further, a careful review of Deputy Norsworthy and Deputy Christian's testimony reveals that much of what the trial court excluded under its March 31, 2000 order was included in other portions of their depositions. Under these facts, we hold that the trial court did not abuse its vast discretion.

Third Party Fault
In the State's next assignment of error, it contends that the trial court prevented it from presenting evidence concerning Chrysler's negligence due to the propensity of the Jeep to roll-over in certain highway situations. The Chrysler group of defendants were made defendants in the action in 1996, but were dismissed by Bozeman in 1998. The State made last-minute efforts in December 1999, and as trial began in January 2000, to assert the issue of Chrysler's negligence. The trial court refused to grant the State a continuance or to allow the record to remain open for evidence concerning this issue.
From our review of the pleadings, we first note that the trial court issued pretrial scheduling orders twice in 1999. The last scheduling order, dated December 6, set trial for January 18, 2000, and required the final exchange of witness and exhibit lists by December 14, as well as the completion of discovery by December 30. The State answered Bozeman's initial petition for damages early in the proceedings in 1993, yet it failed to answer numerous other amending and supplemental petitions. Nevertheless, with the trial court's pre-trial scheduling orders in 1999, it is clear from the record that the parties were in agreement that issue was joined between them, and that the case could proceed to trial.
The State's 1993 answer to Bozeman's suit denied negligence on its part and asserted that the accident was caused solely by Tommy's negligence. The State never made an incidental demand upon Chrysler, nor did it ever assert Chrysler's negligence in defense of Bozeman's claim.
In December 1999, the State filed a pleading entitled "Motion for Leave of Court to Add Expert Witness on Behalf of the Defendant, State of Louisiana." In this motion, the State sought and received an ex parte order allowing it to add John Noettl as a witness for trial. John Noettl was a consulting expert previously hired by Bozeman to review the Jeep roll-over and crash worthiness issue. After the ex parte order, the State had difficulty obtaining Noettl's deposition testimony. Further, Bozeman filed a motion for a protective order on January 10, 2000, seeking to prevent the State from taking Noettl's deposition in Arizona on January 17, 2000, two days before trial. On January 12, the State apparently abandoned any attempt to force Noettl's testimony *367 and sought instead to continue the trial to allow time to develop expert testimony demonstrating Chrysler's negligence.
On the morning of the trial, the trial court heard the State's argument on its motion for continuance in which it admitted its unfulfilled intentions of proving Chrysler's negligence through the plaintiffs former expert. The plaintiff argued to the court that the State never made any affirmative defense asserting the issue of third-party fault. The State filed answers to Bozeman's supplemental petitions on January 20, after plaintiff rested her case-in-chief. After review of the pleadings and the pre-trial chronology of orders fixing the trial setting and related matters, the trial court ultimately denied the State's motion.
La. C.C.P. art. 1551 provides the trial court much discretion in pre-trial scheduling and directives to the parties to control discovery and identify the issues and witnesses for trial. La. C.C.P. art. 1602 states that as a peremptory ground for a continuance, the trial court shall grant the motion "if at the time a case is to be tried, the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain material evidence to his case." Otherwise, the trial court, in its discretion, may grant a continuance, "if there is good ground therefor." La. C.C.P. art 1601.
In this case, we find that the plaintiff, after dismissing her claims against Chrysler, was not on notice through the pleadings and the pre-trial proceedings that the State intended to raise the issue of Chrysler's negligence. The case had been pending for over six years, and the State's responses to the trial court' pre-trial orders did not identify witnesses which would have timely alerted the plaintiff to the State's intent to raise this issue. The State made no showing that it was "unable, with the exercise of due diligence, to obtain material evidence" regarding the Jeep roll-over issue, which in essence became a surprise issue on the eve of trial. The trial court's denial of the State's motion, and its refusal to allow evidence regarding this issue after trial, was not an abuse of its discretion.

Medicare/Medicaid Payments
The State's last assignment of error alleges that the trial court erred "in failing to give a credit or reduction in medical expenses for payments made by Medicaid/Medicare." In its answer to the suit in 1994, the State ambiguously alluded to the payment of Medicaid assistance by alleging that the State "will pay for the injuries sustained by the said Tommy Bozeman in one way or another for the rest of his natural life."
At trial, both parties introduced a joint exhibit, J-1, which is a letter addressed to plaintiffs attorney from the Louisiana Department of Health and Hospitals with a printout showing the amount Medicaid paid for Tommy's medical treatment. The ninety-three page printout itemizes a total of 592 separate claims from various medical providers, which are summarized at the conclusion of the printout as follows:

Approved No. Total
 of Claims: 495 Charges: $481,459.57
Denied No. Total
 of Claims: 97 Charges: 16,891.11
Total No. Total
 of Claims: 592 Charges: $498,350.68
 Total Paid by Program: $291,863.56

In addition to J-1, the plaintiff also introduced copies of actual invoices from several medical providers; many of these invoices can be identified on the Medicaid printout. This duplication of the medical records was discussed at trial in the following exchange at the time of J-1's introduction:

*368 MR. BAILEY: Judge, the state in this case has pled that they're entitled to a credit for the amount the state paid in Medicaid. Medicaid filed a lien, and so we object in this case to the state getting a double credit for what they paid in the Medicaid, but I've agreed to introduce the invoice.
THE COURT: The amount.
MR. BAILEY: The amounts. And Judge, the Medicaid invoice, as far as we are able to determine, included everything. We were unable to find any invoices. So if the Court looks at medical bills, all these medical invoices I have just introduced would be redundant of the Medicaid printout from the state. As far as we're able to determine, all the medical health care providers are recorded in the Medicaid computer printout, and that was supplied to us by the state when they were executing their lien in a prior settlement.
THE COURT: Did they exercise their lien in the prior settlement?
MR. BOOKTER: That's my understanding, Judge.
MR. BAILEY: I'm sorry, Judge. There are more bills in here than are on the printout. I take that back.
The discussion of the prior settlement by the court is an apparent reference to the settlement with Chrysler, the details of which are not in this record.[2] Likewise, the reference to a "lien" filed by the state, which the parties further discussed with the trial court, apparently reflects the state's right to subrogation against a tort-feasor such as Chrysler pursuant to La. R.S. 46:8 and/or any lien right it may have pursuant to La. R.S. 9:4752. The court's further discussion with counsel indicated that the State's "lien" claim was the subject in a companion suit which, the trial court said, it would "need to look at." That companion suit is not in the record. (See footnote 2, supra.)
Based upon the medical expense evidence and the above discussion with the parties, the trial court awarded Bozeman $613,626.64 in special damages. The trial court listed in its reasons for judgment the amount owed to each individual health care provider. While most of those charges are reflected in J-1's total of $498,350.68, some are evidenced only on the additional invoices filed into evidence by plaintiff. From our review of the duplication of these records, we were not able to reconstruct each individual expense charge listed in the trial court's reasons for judgment. We also note that some of the invoices, which are not reflected on the Medicaid summary in J-1, indicate that Medicare was applied in payment of those invoices. The trial court denied the State's request for a credit for Medicaid or Medicare in making the $613,626.64 award, and its ruling occurred before our recent decision in Terrell v. Nanda, 33,242 (La. App.2d Cir.5/10/2000), 759 So.2d 1026, in which the issue of medical expenses affected by Medicaid was reviewed.
When special damages are claimed, they shall be specifically alleged. La. C.C.P. art. 861. Special damages are those which can be fixed with pecuniary certitude. Hollenbeck v. Oceaneering International, Inc., 96-0377 (La.App. 1st Cir.11/8/96), 685 So.2d 163, writ denied, 97-0493 (La.4/4/97), 692 So.2d 421. The tortfeasor must pay those medical expenses which the victim incurs. Terrell, *369 supra. The victim incurs a loss or damages when he has paid or is obligated to pay such expenses.
Based upon the foregoing, it is clear that both sides jointly introduced Exhibit J-1 for different objectives. The plaintiff asserted the information as evidence of $498,350.68 of medical expenses, while the State asserted J-1 to show that Medicaid applied to those expenses. That joint exhibit clearly expanded the pleadings, defeating any assertion that the dictates of La. C.C.P. art. 861 were not followed by plaintiff, or that the State failed to raise any affirmative defense, such as offset, pertaining to the effect of the Medicaid payout. Harrison v. State, Dept. of Highways, 375 So.2d 169 (La.App. 2d Cir. 1979); Jackson v. Town of Grambling, 29,198 (La.App.2d Cir.2/26/97), 690 So.2d 942, 944; and La. C.C.P. art. 1154. The State's assignment of error to this court pertains to the effect of J 1 upon the trial court's award. While the State's initial brief in this matter failed to consider the implication of this court's res nova ruling in Terrell, supra (rendered after the trial court ruling in this case), the appellate court, as recently discussed by our supreme court, may render any judgment which is just, legal and proper upon the record on appeal, despite the lack or clarity of an assignment of error. Nicholas v. Allstate Insurance Co., 99-2522 (La.8/31/00), 765 So.2d 1017.
Nevertheless, as our review of the evidence and the trial court's ruling demonstrates above, the record before us is unclear and incomplete regarding the invoices, the amount of medical expenses written off by Medicaid or Medicare, and the effect, if any, of the prior settlement with Chrysler. Accordingly, pursuant to La. C.C.P. art. 2161, we remand the case for retrial of this issue, so that the court may fix the amount of special damages for medical expenses in view of the Terrell opinion and to the extent that that ruling may be applicable.

Conclusion
For the reasons stated herein, the judgment of the trial court finding the State liable for the unreasonably dangerous condition of the shoulder of the highway is hereby affirmed. However, regarding the issue of the quantum for special damages, the case is hereby remanded to the trial court for retrial of plaintiff's claim for medical expenses for the reasons expressed herein. The costs of this appeal are to be dealt with in accordance with La. R.S. 13:4521.
AFFIRMED IN PART AND REMANDED.
APPLICATION FOR REHEARING
Before BROWN, J., CARAWAY, PEATROSS, KOSTELKA, and DREW, JJ.
Rehearing denied.
NOTES
[1] La. R.S. 9:2800 provides, in pertinent part:

B .... no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
[2] Apparently, Bozeman's supplemental petitions, although filed in this record, were also filed with a different suit number and assigned to a different judge. Plaintiff filed a motion to consolidate which was never ruled on by the trial court. All proceedings regarding Chrysler conducted in the other suit are not in the present record.